**Karen Renee HOWELL**

v.

**STATE of Tennessee.**

Supreme Court of Tennessee,
at Knoxville.

Nov. 16, 2005 Session,
Heard at Kingsport.[1]

March 16, 2006.

---

1. This case was heard as part of the November 16, 2005, S.C.A.L.E.S. (Supreme Court

Advancing Legal Education for Students) project in Kingsport, Sullivan County, Tennessee.

Gary Lee Anderson, Knoxville, Tennessee, and Jason E.B. Smith, Waynesville, North Carolina, for the appellant, Karen Renee Howell.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Mark A. Fulks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and CORNELIA A. CLARK, JJ., joined.

In this post-conviction case, the petitioner contends that she received ineffective assistance of counsel during her juvenile transfer hearing, that her guilty plea was not knowingly, voluntarily, and understandingly entered, and that the post-conviction court erred in refusing to admit an attorney's expert testimony regarding whether defense counsel was ineffective. We hold that the petitioner received effective assistance of counsel during the juvenile transfer hearing. Although defense counsel was deficient in failing to secure and present evidence during the juvenile transfer hearing that the petitioner was committable to a mental health facility, the deficiency did not result in prejudice. We further hold that the petitioner knowingly, voluntarily, and understandingly entered the guilty plea and that the post-conviction court properly excluded the expert testimony. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

The petitioner, Karen Howell, pleaded guilty to three counts of felony murder, one count of attempted first degree murder, two counts each of especially aggravated kidnapping and aggravated kidnapping, and one count of theft of property

valued between $1,000.00 and $10,000.00. These convictions resulted from Howell's participation in the events that concluded in the shooting deaths of Vidar and Delfina Lillelid and their six-year-old daughter, Tabitha, and injury to the Lillelids' two-year-old son, Peter.

On April 6, 1997, Howell and her co-defendants, Natasha Cornett, Crystal Sturgall, Joseph Risner, Dean Mullins, and Jason Bryant, planned a trip from their homes in Pikeville, Kentucky, to New Orleans, Louisiana. At the time, Howell was seventeen years old; Bryant was fourteen years old; and each of the remaining co-defendants was at least eighteen years old. Prior to leaving Kentucky in Risner's vehicle, Howell and her co-defendants secured a nine millimeter handgun, a .25 caliber handgun, and cash. While en route, they discussed the possibility of stealing a vehicle due to the poor condition of Risner's vehicle.

At a rest stop on Interstate 81 near Greeneville, Tennessee, Mr. Lillelid, a Jehovah's Witness, approached Howell and her co-defendants at a picnic table and began discussing his religious views. At some point, Risner displayed one of the firearms and said, "I hate to do you this way, but we are going to have to take you with us for your van." Risner directed the Lillelid family to their van even though Mr. Lillelid offered the group his keys and wallet in exchange for allowing the family to remain at the rest area.

Mr. Lillelid drove the van, and Risner, who was still armed, sat in the passenger seat. Howell, Bryant, and Cornett also rode in the van with the Lillelids. Mullins and Sturgall followed in Risner's vehicle. Mrs. Lillelid began singing in an attempt to console the crying children, and Bryant ordered her to stop. Risner subsequently directed Mr. Lillelid to a secluded road and ordered him to stop the van. Once outside the van, all four members of the Lillelid family were shot multiple times. Bryant claimed that Risner and Mullins were the shooters, but Howell and her remaining co-defendants maintained that Bryant was the shooter. As Risner drove Howell and her co-defendants from the scene, the van struck one or more of the victims.

Howell and her co-defendants were apprehended in Arizona after failing to cross the border into Mexico. At the time of their arrests, Howell and several of her co-defendants had personal items belonging to the Lillelids in their possession.

The State offered Howell and her co-defendants a "package plea offer" whereby the State would not seek the death penalty against the four adult co-defendants if Howell and all of her co-defendants agreed to enter guilty pleas to the offenses. The plea offer provided for concurrent sentences of twenty-five years for each conviction of especially aggravated kidnapping, twelve years for each aggravated kidnapping conviction, and four years for the theft conviction. The trial court would determine the sentences for the felony murder and attempted first degree murder convictions.

Howell and her co-defendants accepted the State's offer. Following a sentencing hearing, the trial court sentenced Howell to life without the possibility of parole for each of the three felony murder convictions and twenty-five years for the attempted murder conviction. The trial court ordered that each sentence be served consecutively. The Court of Criminal Appeals affirmed Howell's sentences on appeal.[2] *See State v. Howell,* 34 S.W.3d 484 (Tenn.Crim.App.2000).

---

**2.** Each of Howell's co-defendants received the

same sentence. On appeal, the Court of

Howell subsequently filed a post-conviction relief petition alleging that she received ineffective assistance of counsel during proceedings in both the juvenile court and the criminal court and that her guilty plea was not knowingly and voluntarily entered. Following a hearing, the post-conviction court denied Howell relief. The Court of Criminal Appeals affirmed the post-conviction court's judgment. We granted review.

## ANALYSIS

### A. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel under the Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution, a petitioner must demonstrate both that counsel's performance was deficient and the deficiency prejudiced the defense. *See Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Goad v. State,* 938 S.W.2d 363, 370 (Tenn.1996). A petitioner's failure to establish either prong justifies the denial of relief. *Nichols v. State,* 90 S.W.3d 576, 586 (Tenn.2002).

To establish deficiency, a petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). We have recognized that:

> [t]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence.... Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting considerations.

*Goad,* 938 S.W.2d at 369 (quoting *Baxter,* 523 S.W.2d at 934–35). In reviewing counsel's conduct, we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Howell claims that defense counsel was ineffective in failing to introduce certain evidence at her transfer hearing in juvenile court. We have previously recognized that the juvenile court has original jurisdiction over children who are alleged to be delinquent. *State v. Hale,* 833 S.W.2d 65, 66 (Tenn.1992); *see* Tenn.Code Ann. § 37–1–134(a) (1996). The juvenile court transferred Howell to the criminal court to be tried as an adult pursuant to Tennessee Code Annotated section 37–1–134(a) (1996). Section 37–1–134(a) lists several criteria that, when met, require a juvenile to be transferred to criminal court to be tried as an adult. *See* Tenn.Code Ann. § 37–1–134(a)(1)–(4) (1996). Included in the criteria is the requirement that the juvenile court find "reasonable grounds" to believe that:

(A) The child committed the delinquent act as alleged;

(B) The child is not committable to an institution for the mentally retarded or mentally ill; and

Criminal Appeals modified Sturgall's sentences from consecutive to concurrent sentences. *State v. Howell,* 34 S.W.3d 484, 487 (Tenn.Crim.App.2000). The court affirmed the sentences for the remaining co-defendants. *Id.*

(C) The interests of the community require that the child be put under legal restraint or discipline.

*Id.* at (a)(4)(A)-(C).[3] The issue in this case is whether defense counsel was deficient in failing to offer evidence that Howell was committable to a mental health facility under subsection (a)(4)(B) and, if so, whether prejudice resulted from that failure.

### 1. Deficiency

■ Howell contends that defense counsel[4] was ineffective in failing to offer evidence at the transfer hearing that she was committable to a mental health facility. In July of 1997, defense counsel contacted Dr. Leonard Miller, a clinical psychologist experienced in evaluating juveniles involved in transfer hearings. Defense counsel requested that Dr. Miller evaluate Howell prior to her transfer hearing. Defense counsel informed Dr. Miller that Dr. Larkin, a psychologist retained by the State, evaluated Howell and concluded that Howell was not committable to a mental health facility and that she met the standards for transfer to criminal court. Defense counsel further informed Dr. Miller that Dr. Larkin's evaluation of Howell was based on a half-hour interview. During the post-conviction hearing, Dr. Miller opined that Dr. Larkin's brief interview with Howell *would not have provided Dr. Larkin with a sufficient basis to assess Howell's mental status.* Dr. Miller stated that he informed defense counsel of his willingness to evaluate Howell but that he did not receive further instruction from defense counsel prior to the transfer hearing.

Defense counsel testified that his failure to offer evidence at the transfer hearing establishing Howell's committability to a mental health facility was a tactical decision. Defense counsel stated that upon first contacting Dr. Miller, the doctor expressed disillusionment over the juvenile transfer process and maintained that "the fight" generally occurs in criminal court. Defense counsel's research of the law applicable to transfer hearings, his conversations with other attorneys in the geographic area, and his examination of the circumstances of the case, including Howell's age, led him to reach the same conclusion. As a result, defense counsel decided to approach the transfer hearing as a means of discovery.

Defense counsel testified that he decided to delay Dr. Miller's evaluation of Howell as long as possible. He explained that if the evaluation raised a possible defense, he "did not want the state to have time before the trial was set to request the Court grant an independent evaluation." Defense counsel further explained that part of his trial strategy was to show Howell as an individual rather than as part of the group that committed the offenses and to keep the co-defendants from learning that Howell would be evaluated.

■ We have previously held that proof of a failed strategy or tactic alone *does not establish deficient representation. House v. State,* 44 S.W.3d 508, 515 (Tenn. 2001). Deference to strategy and tactical choices, however, applies only if the choices are informed and based upon adequate preparation. *Id.* The post-conviction court found that defense counsel's decision

---

3. Tennessee Code Annotated section 37–1–134(a)(4)(B) has since been amended to replace the phrase "mentally retarded" with "developmentally disabled." *See* Tenn.Code Ann. § 37–1–134(a)(4)(B) (2005).

4. During the juvenile transfer hearing, Howell was represented by both defense counsel and defense counsel's partner. Our reference to "defense counsel" only includes the attorney who represented Howell throughout the entire proceedings, including the guilty plea hearing.

to delay the evaluation was tactical. The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See Nichols*, 90 S.W.3d at 586. When examining factual issues, we will not re-weigh or re-evaluate the evidence, and we will defer to the trial court's findings with regard to the credibility of witnesses or the weight of their testimony. *Id.* We conclude, however, that the evidence preponderates against the post-conviction court's finding that defense counsel made a tactical decision to delay the evaluation.

The strategy described by defense counsel during the post-conviction hearing is contradicted by defense counsel's actions before and during the juvenile transfer hearing. Defense counsel originally determined that avoiding transfer was preferable. He wrote a letter to Dr. Miller stating, "Really, we need to do everything in our power to keep [Howell] in Juvenile Court." Defense counsel maintained he then decided to delay the evaluation so that the State would not be alerted to any possible mental infirmities. During the transfer hearing, however, defense counsel's partner, who was serving as co-counsel, informed the juvenile court that the defense had notified the State of the possibility that Howell was committable to a mental health facility.[5] Co-counsel maintained that Dr. Larkin's report could not be introduced absent proper foundation, even though the report was already in the court's file. As a result, a subpoena was issued for Dr. Larkin to testify at the transfer hearing. The transcript of the transfer hearing, therefore, establishes that the defense contested Howell's transfer from juvenile court due to possible mental infirmities, as defense counsel orig-

inally had planned, rather than using the transfer hearing merely as a means of discovery.

The transcript of the hearing also reflects that the issue of committability was not abandoned until after the transfer hearing began. During the transfer hearing, Debra Mackey, a supervisor at the Arizona juvenile detention center where Howell was housed while awaiting extradition to Tennessee, testified that Howell was a "model detainee" who was compliant and courteous. At the conclusion of Mackey's testimony, co-counsel announced that the defense was waiving the issue of committability in light of Mackey's testimony. The subpoena for Dr. Larkin was then withdrawn.

Furthermore, even if defense counsel planned to delay Howell's evaluation to keep the results from the State as long as possible, such a strategy was not based upon adequate investigation. *See House*, 44 S.W.3d at 515. It is unlikely that the trial court would have allowed the defense to ambush the State in such a manner. Defense counsel acknowledged that once he filed a notice to use Dr. Miller as an expert, the trial court would allow the State to obtain "a last minute evaluation if a mental health defense was raised." The trial court certainly would have provided the State with time to develop rebuttal proof. Therefore, defense counsel was deficient in failing to secure Dr. Miller's evaluation of Howell and in failing to present Dr. Miller's findings during the juvenile transfer hearing.

### 2. Prejudice

▇▇▇▇ We must next determine whether defense counsel's deficiencies resulted

---

5. When the Court of Criminal Appeals rendered its opinion, two of the three volumes of the transcript of evidence from the juvenile transfer hearing were not included in the appellate record. After granting permission to appeal, we allowed Howell to supplement the appellate record with the complete transcript of evidence from the transfer hearing.

in prejudice. In a case involving a guilty plea, a petitioner who is seeking to establish that a deficiency resulted in prejudice must demonstrate " 'that there is a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial.' " *Id.* at 516 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). A "reasonable probability" is defined as a probability that sufficiently undermines confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

Tennessee Code Annotated section 37–1–134(a)(1) through (4) provides the circumstances in which a juvenile court "shall" transfer a juvenile accused of conduct that constitutes a criminal offense to the criminal court to be tried as an adult. The juvenile must be at least sixteen years old at the time of the offense or be charged with certain enumerated offenses and be provided with notice and a hearing. Tenn.Code Ann. § 37–1–134(a)(1)–(3) (1996). During the hearing, the juvenile court must find "reasonable grounds to believe" that the juvenile committed the delinquent act as alleged; that the juvenile "is not committable to an institution for the mentally retarded or mentally ill"; and that the community's interests require legal restraint or discipline of the juvenile. *Id.* at (a)(4)(A)-(C). Unless these grounds are found by the juvenile court, transfer from juvenile court to criminal court is subject to the juvenile court's discretion. *Id.* at (a) ("After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense …, the court, before hearing the petition on the merits, *may* transfer the child … to be dealt with as an adult in the criminal court of competent jurisdiction.") (emphasis added). In transferring Howell to the criminal court, the juvenile court found reasonable grounds to believe that all three prongs of Tennessee Code Annotated section 37–1–134(a)(4) were present: Howell committed the acts as alleged; she was not committable to a mental health facility; and the interests of the community required that she be put under legal restraint or discipline. *See id.* at (a)(4)(A)-(C).

To determine whether defense counsel's deficiency affected Howell's transferability, we must examine whether the juvenile court would have had "reasonable grounds to believe" that Howell was committable to a mental health facility if defense counsel had secured Dr. Miller's report and presented it at the transfer hearing. *See id.* at (a)(4)(B). If so, we then must decide whether the juvenile court's decision to transfer Howell regardless of whether she was committable to an institution would constitute an abuse of discretion.

Although defense counsel failed to have Howell evaluated prior to the juvenile transfer hearing, Howell was later evaluated by Dr. Miller. Dr. Miller's report was presented during the sentencing hearing. Dr. Miller's report stated that Howell was bipolar with psychotic features and was suffering from post-traumatic stress disorder. Dr. Miller opined at the post-conviction hearing that Howell was also suffering from depression at the time of the evaluation and that Howell was involuntarily committable to a mental health facility at the time of the transfer hearing due to "suicidality [sic] and the psychotic element."

The post-conviction court, however, refused to accredit Dr. Miller's testimony and report, finding that the details of Dr. Miller's report refute his testimony that Howell was committable at the time of the juvenile transfer hearing. The details listed in Dr. Miller's report found by the post-conviction court to be inconsistent with Dr. Miller's conclusions were: 1) that Howell

was alert, lucid, and oriented in all spheres; 2) that she was verbal and spontaneous; 3) that she demonstrated "balanced affect throughout"; 4) that she did not demonstrate signs or overt symptoms of anxiety or depression; 5) that she was not suffering from primary mental retardation and had the potential to function within the average range of intelligence; and 6) that "she shows signs of a post-traumatic stress disorder though she does not show sufficient indications to warrant this diagnosis." The post-conviction court further recognized that Dr. Miller had not found Howell to be incompetent or insane.

During the post-conviction hearing, Howell also presented the testimony of Dr. Pamela Auble, a clinical neuropsychologist who evaluated Howell in July of 2002 and reviewed Dr. Miller's report in preparation for the post-conviction hearing. Dr. Auble testified that she did not doubt Dr. Miller's findings and diagnosis. Dr. Auble stated her evaluation of Howell indicated that she no longer suffers from depression but continues to suffer from post-traumatic stress disorder. The post-conviction court also refused to accredit Dr. Auble's testimony regarding Howell's committability at the time of the transfer hearing because Dr. Auble's conclusions were based on Dr. Miller's report.

The evidence does not preponderate against the post-conviction court's findings regarding the inconsistencies in Dr. Miller's report and its refusal to accredit the report and the testimony of Dr. Miller and Dr. Auble. In light of the inconsistencies

in Dr. Miller's report and Dr. Larkin's conclusion that Howell was not committable, even if defense counsel had presented Dr. Miller's report at the transfer hearing, the juvenile court would have had "reasonable grounds" to believe that Howell was not committable.[6] Accordingly, Howell has failed to establish prejudice by clear and convincing evidence.[7] *See* Tenn.Code Ann. § 40–30–210(f) (1997).[8]

## B. Guilty Plea

A guilty plea must be voluntarily, understandingly, and knowingly entered to pass constitutional muster. *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *State v. Neal*, 810 S.W.2d 131, 134–35 (Tenn.1991), *overruled in part on other grounds by Blankenship v. State*, 858 S.W.2d 897 (Tenn. 1993). In examining whether a guilty plea was knowingly and voluntarily entered, the standard is " 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " *Jaco v. State*, 120 S.W.3d 828, 831 (Tenn.2003) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)). The trial court may consider a number of factors in making this determination. *Blankenship*, 858 S.W.2d at 904. These factors include: 1) the defendant's relative intelligence; 2) the defendant's familiarity with criminal proceedings; 3) the competency of counsel and the defendant's opportunity to confer with counsel about alternatives; 4) the advice of counsel and the court

---

6. We recognize that the Court of Criminal Appeals has held that Tennessee Code Annotated section 37–1–134(a)(4)(B) requires that the juvenile be subject to *involuntary* commitment to prevent a transfer. *See State v. Simmons*, 108 S.W.3d 881, 886 (Tenn.Crim.App. 2002). We need not reach this issue under the circumstances of the present case.

7. In light of our holding, we need not reach the issue of whether a juvenile court's decision to transfer a juvenile who is committable to a mental institution constitutes an abuse of discretion.

8. This statute has since been renumbered and currently appears as Tennessee Code Annotated section 40–30–110(f) (2003).

about the charges and the penalty to be imposed; and 5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. *Id.*

### 1. Group Plea Hearing

The trial court in the present case conducted a group plea hearing during which the court questioned Howell and her co-defendants both individually and as a group. Howell contends that the procedure employed by the trial court was coercive and, when combined with her mental deficiencies, prevented her from understanding the trial court's questions.

■■■ Before accepting a guilty plea, the trial court must question the defendant on the record to ensure that the defendant is knowingly and voluntarily entering the plea. *See Boykin,* 395 U.S. at 243–44, 89 S.Ct. 1709; *Neal,* 810 S.W.2d at 135–36; *see also* Tenn. R.Crim. P. 11(d). In *Boykin v. Alabama,* the United States Supreme Court held that the trial court must question the defendant to ensure the defendant understands that by entering the plea he is waiving the privilege against self-incrimination, the right to a jury trial, and the right to confront his accusers. 395 U.S. at 243–44, 89 S.Ct. 1709.

■■■ In addition to *Boykin's* requirements, trial courts in Tennessee must question the defendant on the record to ensure that the defendant understands: 1) the nature of the charge to which the plea is offered and the mandatory minimum and maximum penalty provide by law; 2) the right of the defendant to be represented by counsel at every stage of the proceedings; 3) the right of the defendant to plead not guilty and to persist in that plea, the right to a jury trial, the right to assistance of counsel at trial, the right to confront and cross-examine witnesses against him, and the right against compelled self-incrimination; 4) that by pleading guilty or

nolo contendere, the defendant waives the right to a trial; and 5) that if the defendant enters a guilty or nolo contendere plea, the trial court may question the defendant regarding the offenses and that any of the defendant's answers made under oath, on the record, and in counsel's presence may later be used against the defendant in a subsequent prosecution for perjury or false statement. Tenn. R.Crim. P. 11(c)(1)-(5); *Neal,* 810 S.W.2d at 135–36. The defendant also must be advised that additional punishment may result from his guilty plea by reason of his prior convictions or other factors and that the resulting conviction may be used against him to enhance his punishment for subsequent convictions. *Neal,* 810 S.W.2d at 136.

■■■ Howell does not contend that she did not receive the specific advice required by *Boykin, Neal,* and Rule 11 of the Tennessee Rules of Criminal Procedure. Rather, Howell challenges the manner in which the advice was given. Absolute literal compliance with the advice to be given by the trial court is not required. *Neal,* 810 S.W.2d at 137. Rather, the trial court must substantially comply with these mandates. *Id.; State v. Newsome,* 778 S.W.2d 34, 38 (Tenn.1989). A trial court substantially complies with these mandates when it expresses the sense of the substance of the required advice to a defendant who is seeking to plead guilty. *Neal,* 810 S.W.2d at 137. Substantial compliance does not constitute error. *Id.* at 138. "Where there is substantial compliance the root purpose of the prescribed litany has been served and the guilty plea passes due process scrutiny because it was made voluntarily and understandingly." *Id.*

■■■ This Court has indicated that en masse guilty plea hearings do not comply with our state's mandates. *See State v. McClintock,* 732 S.W.2d 268, 273 (Tenn.

1987). We since have recognized, however, that a trial court substantially complies with the mandates of *Boykin, Neal,* and Rule 11 of the Tennessee Rules of Criminal Procedure when the trial court communicates the entire litany of rights and other required information "to multiple defendants in the presence of their respective attorneys, so long as the number involved is not so great as to make individual understanding unlikely; and provided that each defendant is addressed individually to establish on the record the understanding and agreement of each defendant." *Neal,* 810 S.W.2d at 137–38. Therefore, while we caution trial courts against conducting group plea hearings, such hearings do not constitute *per se* violations of *Boykin, Neal,* and Rule 11 of the Tennessee Rules of Criminal Procedure.

▆▆▆ During the plea hearing, the trial court questioned Howell and her co-defendants both individually and as a group. The transcript of the plea hearing demonstrates that "[a]ll defendants answered affirmatively" or "[a]ll defendants answered negatively" when the trial court asked each question of the group. When the answers of any of the defendants differed, each of the defendants was named in the transcript, and his or her answer followed. These portions of the transcript establish that Howell answered in an understanding manner to each question asked.

For example, the trial court asked Howell and her co-defendants jointly whether they had consumed alcohol or drugs within the past twenty-four hours. The transcript reflects that "Defendants Risner, Cornett, Mullins, Bryant and Howell answered negatively." Sturgall gave an affirmative answer and an explanation. Howell and her co-defendants were aware that their answers need not match those of the group and that the trial court would allow a defendant to explain an answer

that differed from those of the group. Accordingly, Howell has failed to establish that the nature of the plea proceeding was so coercive as to render her plea involuntary.

At the post-conviction hearing, Dr. Miller and Dr. Auble both testified that the circumstances of the plea hearing when combined with Howell's mental deficiencies prevented Howell from knowingly and understandingly entering a guilty plea. Dr. Miller stated that the plea hearing would have been stressful for Howell due to her diminished psychological state. Both Dr. Miller and Dr. Auble opined that Howell was unable to comprehend the events of the plea hearing, that she experienced difficulties concentrating on the information presented to her, and that she was unable to understand the questions asked by the trial court.

The post-conviction court, however, refused to accredit the testimony of Dr. Miller and Dr. Auble. Rather, the evidence establishes that Howell was capable of understanding the proceedings. The post-conviction court found that during each occasion in which Howell testified, she demonstrated the ability to understand statements made to her and questions asked of her and was able to effectively communicate with those questioning her. Dr. Miller stated that Howell's I.Q. of seventy-eight did not affect her ability to enter a knowing and voluntary guilty plea and that he did not believe that Howell was suffering from mental retardation. Dr. Miller acknowledged that Howell was aware of the nature of the proceedings and was able to assist defense counsel in preparing her defense. Defense counsel likewise testified that Howell was able to assist him in her case.

Furthermore, Dr. Miller's opinions were based in part upon Howell's contentions regarding defense counsel's lack of prepa-

ration and his conversations with her prior to the plea hearing. The post-conviction court accredited defense counsel's testimony regarding his actions in preparing Howell for the plea hearing. Defense counsel testified that he met with Howell on many occasions during which they engaged in extensive conversations regarding every aspect and consequence of the plea agreement. They discussed all of the charges, the lesser-included offenses, possible sentences including consecutive and concurrent sentencing, and mitigation evidence. Defense counsel stated he had obtained a list of the questions that the trial court generally asked during guilty plea hearings. He reviewed the questions with Howell and informed her of all of the rights that she would be waiving by pleading guilty.

We conclude that the record supports the post-conviction court's findings with regard to the testimony of Dr. Miller, Dr. Auble, and defense counsel. *See Nichols,* 90 S.W.3d at 586 (providing that when examining factual issues, this Court will not re-weigh or re-evaluate the evidence, but will defer to the post-conviction court's findings with regard to the credibility of witnesses or the weight of their testimony). We, therefore, hold that Howell has failed to establish that the manner in which the group plea was held violated *Boykin, Neal,* and Rule 11 of the Tennessee Rules of Criminal Procedure and that as a result of the violation, she was coerced into entering the plea without an understanding of the proceedings and the consequences of pleading guilty.

### 2. Package Plea Agreement

Howell further contends that she was coerced into pleading guilty due to the nature of the package plea agreement. The plea agreement provided that if Howell and her five co-defendants entered

guilty pleas, the State would not seek the death penalty against the four adult co-defendants. Because Howell was a juvenile at the time of the offenses, she was not subject to the death penalty. *See* Tenn.Code Ann. § 37–1–134(a)(1) (1996).

 A "package deal" or "wired" plea agreement exists where the prosecution conditions the acceptance of a plea agreement on a co-defendant's willingness to accept a plea agreement. *United States v. Hodge,* 412 F.3d 479, 489 (3d Cir.2005); *United States v. Gamble,* 327 F.3d 662, 664 n. 4 (8th Cir.2003). The United States Supreme Court has reserved judgment on the constitutional implications of package plea agreements. *See Bordenkircher v. Hayes,* 434 U.S. 357, 364 n. 8, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). With regard to plea bargaining in general, however, the United States Supreme Court has stated that "[d]efendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation." *Id.* at 363, 98 S.Ct. 663. The acceptance of the legitimacy of plea bargaining implies the rejection of any idea that a guilty plea is involuntary as the end result of the plea bargaining process. *Id.* Although confronting a defendant with the risk of more severe punishment may effectively discourage a defendant from asserting his trial rights, the imposition of these difficult choices upon a defendant is " 'inevitable' " and " 'permissible' " in a " 'legitimate system which tolerates and encourages the negotiation of pleas.' " *Id.* at 364, 98 S.Ct. 663 (quoting *Chaffin v. Stynchcombe,* 412 U.S. 17, 31, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973)).

 The issue before this Court is whether the practice of offering package pleas is so coercive that it renders the resulting guilty plea involuntary. A prac-

tice that is coercive or renders a plea involuntary is one that creates improper pressure that likely would overbear the will of innocent people causing them to plead guilty. *United States v. Pollard*, 959 F.2d 1011, 1021 (D.C.Cir.1992). A guilty plea is rendered involuntary only by physical harm, threats of harassment, misrepresentation, or " 'promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g., bribes).' " *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (quoting *Shelton v. United States*, 246 F.2d 571, 572 n. 2 (5th Cir. 1957), (en banc) *rev'd on confession of error on other grounds*, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958)).

■ We do not believe that the nature of a package plea agreement is such that it is likely to overbear the will of an innocent person and cause the person to plead guilty. A guilty plea entered to avoid the possibility of a death penalty may be valid. *Id.* at 755, 90 S.Ct. 1463. Even in circumstances in which a defendant enters a plea to avoid facing the death penalty but continues to maintain his innocence, the plea is valid as long as the record contains adequate evidence of guilt. *See North Carolina v. Alford*, 400 U.S. 25, 37–38, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). We, like the Eighth Circuit, observe that " '[s]ince a defendant's plea is not rendered involuntary because he enters it to save himself [from the death penalty], it is difficult to see why the law should not permit the defendant to negotiate a plea that confers a similar benefit on others.' " *United States v. Vest*, 125 F.3d 676, 679 (8th Cir. 1997) (quoting *United States v. Marquez*, 909 F.2d 738, 742 (2d Cir.1990)).

■ Furthermore, the majority of jurisdictions that have addressed the issue have held that package plea agreements are not invalid per se. *See, e.g., Hodge*, 412 F.3d at 490; *Vest*, 125 F.3d at 679; *Pollard*, 959 F.2d at 1020–21; *United States v. Marquez*, 909 F.2d 738, 741–42 (2d Cir.1990); *United States v. Wheat*, 813 F.2d 1399, 1405 (9th Cir.1987); *State v. Jaramillo*, 152 Ariz. 394, 733 P.2d 279, 280–81 (1987); *In re Ibarra*, 34 Cal.3d 277, 193 Cal.Rptr. 538, 666 P.2d 980, 985 (1983); *Stinson v. State*, 839 So.2d 906, 908–09 (Fla.Dist.Ct.App.2003); *State v. Bey*, 270 Kan. 544, 17 P.3d 322, 331 (2001); *Butala v. State*, 664 N.W.2d 333, 339 (Minn.2003); *People v. Fiumefreddo*, 82 N.Y.2d 536, 605 N.Y.S.2d 671, 626 N.E.2d 646, 650 (1993); *State v. Williams*, 117 Wash.App. 390, 71 P.3d 686, 690–91 (2003).[9] We join these jurisdictions and hold that package plea agreements are not invalid per se.

The United States Supreme Court, however, has recognized that package plea agreements "might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks that a defendant must consider." *Bordenkircher*, 434 U.S. at 364 n. 8, 98 S.Ct. 663. A defendant may be pressured to plead guilty by a co-defendant who believes that he will get a better deal under the agreement. *United States v. Mescual–Cruz*, 387 F.3d 1, 7 (1st Cir.2004). Package plea agreements also present an opportunity for a defendant to manipulate the system. A defendant who has obtained a benefit for a co-defendant may move to withdraw his own plea after the co-defendant has received the benefit. *Id.* at 8. As a result, certain safeguards should apply with regard to package plea agreements.

---

9. The Tennessee Court of Criminal Appeals also has recognized that package plea agreements are valid. *See, e.g., Parham v. State*, 885 S.W.2d 375, 382 (Tenn.Crim.App.1994); *State v. Street*, 768 S.W.2d 703, 711 (Tenn. Crim.App.1988).

In cases involving leniency toward a third party or a promise not to prosecute a third party, the prosecution must act in good faith. *See, e.g., Gamble,* 327 F.3d at 664; *Miles v. Dorsey,* 61 F.3d 1459, 1468 (10th Cir.1995); *Politte v. United States,* 852 F.2d 924, 929–30 (7th Cir.1988); *Stinson,* 839 So.2d at 909. The prosecution acts in good faith when it has probable cause to charge the third party at the time the prosecution offers leniency for the third party to the defendant or at the time the prosecution threatens the defendant with charging the third party. *Miles,* 61 F.3d at 1468; *Stinson,* 839 So.2d at 909.

In the present case, the four adult co-defendants were indicted for the same offenses with which Howell was charged. *See Politte,* 852 F.2d at 929 (holding that a strong presumption of good faith exists when an indictment has been returned against a third party). The State also had evidence establishing several aggravating circumstances that would have supported the imposition of the death penalty against the four adult co-defendants. The trial court applied these aggravating circumstances in sentencing the co-defendants to life without parole. Once the State had probable cause to prosecute the adult co-defendants and seek the death penalty against them, the State was entitled to prosecute them fully or offer them leniency in exchange for the guilty pleas of Howell and her co-defendants. Accordingly, by offering not to seek the death penalty against the four adult co-defendants if Howell and her co-defendants agreed to plead guilty, the State was offering to refrain from taking action that it was legally authorized to take. *See Miles,* 61 F.3d at 1469.

The nature and terms of the package plea agreement must be disclosed to the trial court prior to questioning the defendant at the plea hearing. *See, e.g.,* *Hodge,* 412 F.3d at 490–91; *Mescual–Cruz,* 387 F.3d at 8; *United States v. Abbott,* 241 F.3d 29, 34 (1st Cir.2001); *United States v. Caro,* 997 F.2d 657, 659–60 (9th Cir.1993); *Bey,* 17 P.3d at 332; *Williams,* 71 P.3d at 691. When a defendant's plea rests on the prosecution's promise that a co-defendant will benefit, the promise is a material term of the plea agreement. *Hodge,* 412 F.3d at 490. Disclosure of these material terms presents the trial court with the opportunity to probe as deeply as necessary into the possibility that a defendant is entering a plea against his will so that his co-defendant will obtain leniency. *Abbott,* 241 F.3d at 34. The record in the present case adequately demonstrates that the trial court was aware of the nature of the plea agreement entered into by Howell and her co-defendants.

An issue remains as to the extent of the questioning required by a trial court of a defendant who seeks to enter a guilty plea based on a package plea agreement. When the defendant seeks to enter a guilty plea as part of a package plea agreement, some jurisdictions require the trial court to make additional inquiries beyond those mandated by *Boykin* and by that jurisdiction. *See, e.g., Jaramillo,* 733 P.2d at 280–81; *In re Ibarra,* 193 Cal.Rptr. 538, 666 P.2d at 986–87; *Butala,* 664 N.W.2d at 339. These jurisdictions require the trial court to specifically inquire into the circumstances surrounding the package plea agreement. *In re Ibarra,* 193 Cal.Rptr. 538, 666 P.2d at 986. These circumstances include whether: 1) the inducement to plead was proper in that the prosecutor acted in good faith and had a reasonable case against the third party to whom leniency is promised; 2) there is a factual basis for the plea in terms of supportable evidence and proportionality of the sentence; 3) the nature and degree of coer-

cion and psychological pressure upon the defendant indicate that the plea is involuntary; 4) the promise of leniency to another was a significant concern to the defendant in choosing to plead guilty; and 5) any other factor impermissibly influenced the defendant's plea. *Id.* at 986–87.

We conclude, however, that the current procedures trial courts in Tennessee are required to follow in guilty plea hearings are sufficient to assess the voluntariness of a guilty plea entered as part of a package plea agreement. The majority of jurisdictions also have declined to mandate an additional inquiry. *See, e.g., Mescual–Cruz,* 387 F.3d at 8; *United States v. Farley,* 72 F.3d 158, 163–64 (D.C.Cir.1995); *Fiumefreddo,* 605 N.Y.S.2d 671, 626 N.E.2d at 651. Rather, the trial court must conduct the colloquy with special care, showing sensitivity to the issue of voluntariness. *Hodge,* 412 F.3d at 491; *Mescual–Cruz,* 387 F.3d at 8. Additional procedures are not mandated. *Mescual–Cruz,* 387 F.3d at 8. Therefore, the existence of a package plea agreement is but one circumstance, in addition to those delineated in *Blankenship,* 858 S.W.2d at 904, a court may consider in determining whether a guilty plea was voluntarily, knowingly, and understandingly entered.

■ The trial court in the present case substantially complied with the federal and state mandates with regard to guilty pleas. *See Neal,* 810 S.W.2d at 137–38. The trial court questioned Howell and her co-defendants to determine if they had received any threats, pressure, or promises to plead guilty other than the promises contained in the plea agreements. Howell and her co-defendants stated that they had not. This question was broad enough to encompass not only the traditional types of coercion but the unique pressures from a co-defendant or family member that may arise in a package plea agreement. *Mescual–Cruz,*

387 F.3d at 9–10; *cf. United States v. Martinez–Molina,* 64 F.3d 719, 734 (1st Cir.1995) (holding that the trial court failed to conduct an adequate inquiry into the voluntariness of the package plea agreement when the court only asked the defendant whether he had been threatened or pressured by the prosecution). The trial court also asked Howell whether she was entering the guilty plea because she actually was guilty of the offenses, and Howell replied, "Yes."

The post-conviction court accredited defense counsel's testimony that Howell had stated, "[W]hatever it took she wanted to sign off on the agreement." Defense counsel did not pressure Howell into pleading guilty. Defense counsel would not agree to the plea until he was certain that Howell fully understood what she was doing and that the plea was in Howell's best interest. The post-conviction court found that Howell never expressed reservations about the plea and that defense counsel never had cause to believe that Howell could not voluntarily, knowingly, and understandingly enter the plea.

The post-conviction court found that Howell was motivated to enter the plea in part by her desire to save her four adult co-defendants from the death penalty. The record shows that Howell also was motivated by her desire to avoid the torment of a trial, particularly for her family, whom she requested exit the courtroom prior to her testimony at the sentencing hearing.

In addition, defense counsel testified that Howell stated that she wanted a chance to be free from incarceration one day. The post-conviction court recognized that the evidence was "overwhelming and horrible" and that Howell "deliberately and knowingly participated in every aspect of the killings." Howell aided in planning the events that led to the killings. She

helped steal the guns that were used in the killings and the money that funded the trip. She was at the picnic table when the Lillelid family was kidnapped and observed the children as they cried. Howell was standing outside the van watching as the Lillelids were shot multiple times. She took no action to attempt to stop the killings. Howell participated in the escape, and items belonging to the Lillelid family were found on her person. Defense counsel reasonably believed that a jury would find Howell guilty of the charges, including the first degree murders, and impose the maximum sentences of life without parole. Defense counsel's belief that Howell's best chance of receiving a lesser sentence was through sentencing by the trial court was also reasonable.

During the sentencing hearing, defense counsel presented substantial evidence in an attempt to achieve the minimum possible sentence for Howell. As a result of defense counsel's efforts, the trial court applied more mitigating factors to Howell than to any of her co-defendants. The trial court, nevertheless, imposed the maximum sentences of life without parole and ordered that the sentences be served consecutively. The validity of a plea, however, may not be collaterally attacked merely on the basis that the defendant made, in retrospect, what turned out to be a poor deal. *Bradshaw v. Stumpf,* 545 U.S. 175, 125 S.Ct. 2398, 2407, 162 L.Ed.2d 143 (2005). Any shortcomings of Howell's plea agreement cast doubt on the validity of her guilty plea only if it is demonstrated either that Howell agreed to the unfavorable plea based on the constitutionally defective advice of counsel or that Howell could not have understood the terms of the plea agreement. *See id.* We are unable to conclude that either instance occurred in this case. Accordingly, we hold that Howell knowingly, voluntarily, and under-standingly entered the guilty plea with effective assistance of counsel.

## C. Expert Testimony

Howell maintains that the post-conviction court erred in excluding the expert testimony of W. Thomas Dillard, a criminal defense attorney, regarding the effectiveness of defense counsel. Questions concerning the qualifications, admissibility, relevancy, and competency of expert testimony generally are left to the trial court's discretion. *Brown v. Crown Equip. Corp.,* 181 S.W.3d 268 (Tenn.2005). This Court will not overturn a trial court's decision to admit or exclude expert testimony absent an abuse of that discretion. *Id.* A trial court abuses its discretion by applying an incorrect legal standard or reaching an illogical or unreasonable decision that causes the complaining party to suffer an injustice. *Id.*

Admissibility of expert testimony in Tennessee is governed in part by Rule 702 of the Tennessee Rules of Evidence. Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise."

The admissibility of evidence pursuant to Rule 702 of the Tennessee Rules of Evidence is more stringent than its federal counterpart. Rule 702 of the Federal Rules of Evidence requires that the evidence "assist the trier of fact," while Rule 702 of the Tennessee Rules of Evidence requires that the evidence "substantially assist the trier of fact." Therefore, "the probative force of the testimony must be stronger before it is admitted in Tennessee." *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 264 (Tenn.1997).

The post-conviction judge stated that he had ten years of experience as a criminal defense attorney and more than twenty-five years of experience as a criminal court judge. The post-conviction judge further stated that he knew the standards for ineffective assistance of counsel and how to apply them. The post-conviction court found that it did not need the assistance of an expert in determining the issue of ineffective assistance of counsel and that Dillard's testimony would not substantially assist the trier of fact. We conclude that the post-conviction court's decision to exclude Dillard's testimony constitutes a proper exercise of its discretion.

## CONCLUSION

We conclude that defense counsel was deficient in failing to secure and present Dr. Miller's report during Howell's juvenile transfer hearing but that the deficiency did not result in prejudice. We further conclude that Howell knowingly, voluntarily, and understandingly entered the guilty plea. Finally, we hold that the post-conviction court properly excluded Dillard's expert testimony. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

Because the record indicates that Howell is indigent, the costs of appeal are taxed to the State of Tennessee.